## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN - SOUTHERN DIVISION

**DEVON ECHOLS,**

          **Petitioner,**

                                              **Civil Action No.**

**CAROL R. HOWES, WARDEN,**                      **HON.**
**LAKELAND CORRECTIONAL FACILITY**

          **Respondent.**

_____/
**JAMES E. CZARNECKI II (P67847)**
**Attorney for Petitioner**
_____/

## CIVIL COVER SHEET
## PETITION FOR WRIT OF HABEAS CORPUS
## BRIEF IN SUPPORT

BY:    JAMES E. CZARNECKI II (P67847)
          Attorney At Law
          39999 Garfield Road
          Clinton Township, MI 48038
          586.228.3900

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF MICHIGAN - SOUTHERN DIVISION**

**DEVON ECHOLS,**
                          **Petitioner,**

                                                           **Civil Action No.**

**CAROL R. HOWES, WARDEN,**                               **HON.**
**LAKELAND CORRECTIONAL FACILITY**

                          **Respondent.**
_____/

**PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner Devon Echols, through his attorney, James E. Czarnecki II, respectfully states:

1. Devon Echols is a citizen of the United States, is a resident of Branch County, Michigan and is currently imprisoned in Coldwater, Michigan.

2. Devon Echols is currently unconstitutionally detained an imprisoned by the Respondent, Carol R. Howes, at the Lakeland Correctional Facility, where Devon Echols is serving a term of 12 years, imposed by Judge Amy P. Hathaway of the Wayne County Circuit Court, after a jury found Devon Echols guilty of felony firearm and assault with intent to murder.

3. Petitioner has exhausted all state remedies available to him with regard to the Sixth and Fourteenth Amendments raised in this petition by taking the following steps:

a. Mr. Echols raised the Sixth and Fourteenth Amendment issues in the trial court in a Motion for Relief from Judgment, MCR 6.500. On June 14, 2006, the trial court, Judge Amy Hathaway denied the Motion for Relief from Judgment.

b. Mr. Echols raised the Sixth and Fourteenth Amendment issues in the Michigan Court of Appeals. The point headings of the first issue presented in his Application for Leave to Appeal were:

I. THE TRIAL COURT ERRED REVERSIBLY IN REFUSING TO SUPPRESS TAINTED IDENTIFICAITON EVIDENCE AFTER PETITIONER'S *WADE* HEARING.

II. PETITIONER ECHOLS WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AND TO A FAIR TRIAL THROUGH TRIAL COUNSEL'S FAILURE TO PRESENT LONA BROWN'S TESTIMONY IN SUPPORT OF HIS ALIBI DEFENSE.

b. On August 20, 2007, in a one sentence Order, the Michigan Court of Appeals denied Petitioner's Application for Leave to Appeal without a hearing. The Order acts as a denial on the merits. *People v Echols,* No. 278675 (Mich. Ct. App. 2007) (attached as Appendix A to the accompanying Memorandum of Law.

c. Mr. Echols then timely filed an Application for Leave to Appeal to the Michigan Supreme Court, in which he again raised the identical issues presented in this petition. The Michigan Supreme Court denied leave to appeal in an order issued on January 8, 2008. (*People v Echols*, No. 135042) (attached as Appendix B to the accompanying Memorandum of Law.

4. As set forth in the Memorandum of Law, Devon Echols is being detained in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

5. Devon Echols has not filed any previous Petition for Writ of Habeas Corpus in this or any other federal district court.


**RELIEF REQUESTED**

For these reasons, Petitioner, Devon Echols, asks:

A. That Respondent be required to appear and answer the allegations of this Petition;

B. That after full consideration, this Court grant this Petition and order that Devon Echols either be promptly retried or released from custody;

C. That this Court grant such other, further, and different relief as the Court may deem just and proper under the circumstances; and

D. That this Court grant oral argument in this matter.


**Date: January 7, 2009**

Respectfully submitted,


By:/s/_____
 JAMES E. CZARNECKI II (P67847)
Attorney At Law
39999 Garfield Road
Clinton Township, MI 48038
586.228.3900

## UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF MICHIGAN-SOUTHERN DIVISION

**DEVON ECHOLS,**

                    **Petitioner,**

                                                  **Civil Action No.**

**CAROL R. HOWES, WARDEN,**                       **HON.**
**LAKELAND CORRECTIONAL FACILITY**

                    **Respondent.**

_____/

**JAMES E. CZARNECKI II (P67847)**
**Attorney for Petitioner**

_____/

## MEMORANDUM OF LAW IN SUPPORT OF
## PETITION FOR WRIT OF HABEAS CORPUS

BY:    JAMES E. CZARNECKI II (P67847)
        Attorney At Law
        39999 Garfield Road
        Clinton Township, MI 48038
        586.228.3900

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ i

STATEMENT OF QUESTIONS PRESENTED .......................................................... iii

STATEMENT OF FACTS ........................................................................................ 1

STANDARD OF REVIEW ....................................................................................... 6

ARGUMENT

I.    THE IDENTIFICATION EVIDENCE USED IN TRIAL AGAINST PETITIONER VIOLATED PETITIONER'S RIGHT TO DUE PROCESS OF LAW. …………………………………………………………………………...……8


     II.    PETITIONER WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AND TO A FAIR TRIAL THROUGH TRIAL COUNSEL'S FAILURE TO PRESENT LONA BROWN'S TESTIMONY IN SUPPORT OF HIS ALIBI DEFENSE…………………………………………….19


CONCLUSION.................................................................................................... 26

APPENDIX A (Michigan Court of Appeals Order)

APPENDIX B (Michigan Supreme Court Order)

# TABLE OF AUTHORITIES

## FEDERAL CASES

Baldwin v Reese, 541 U.S 27., 124 S.Ct 1347 (2004)…………………………………….. 6

Blackburn v. Foltz, 828 F.2d 1177 (6th Cir.1987)………………………………...19, 22, 23

Bryant v. Scott, 28 F.3d 1411 (5th Cir.1994)…………………………………………… 20, 24

Henderson v. Sargent, 926 F.2d 706 (8th Cir.1991)……………………………………… 20

Horton v. Zant, 941 F.2d 1449 (11th Cir.1991)………………………………………….. 21

Kimmelman v. Morrison, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986)……….. 20

Levine v Tornik, 986 F.2d 1506, 1516 (6th Cir. 1993), cert denied, 509 U.S. 907 (1993)... 6

Lockhart v. Fretwell, 506 U.S. 364, 368 (1993)……………………………………….. 19

Manning v Alexander, 912 F.2d 878 (6th Cir. 1990)……………………………………… 6

Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)……… 8, 10, 11

Matthews v. Abramajtys, 319 F.3d 780 (6th Cir.2003)……………………………… 19, 22

Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)……………. 10, 11, 13

Roe v. Flores-Ortega, 528 U.S. 470, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000)…………. 21

Simmons v United States, 390 US 377, 88 S Ct 967 (1968)…………………………. 10, 11

Sims v. Livesay, 970 F.2d 1575, 1580-81 (6th Cir.1992)……………………………….. 21

*Stovall v Denno*, 388 US 293; <u>87 S Ct 1967</u>; <u>18 L Ed 2d 1199 (1967)</u>………………….. 10

Thigpen v. Cory, 804 F.2d 893, 895 (6th Cir.1986), cert. denied, 482 U.S. 918, 107 S.Ct.
  3196, 96 L.Ed.2d 683 (1987)……………………………………………………… 10, 11

Towns v. Smith, 395 F.3d 251 (6th Cir. 2005)……………………………………… 19

Tucker v Prelesnik, 181 F3d 747 (6th Cir. 1999)…………………………………………… 23

*United States v Wade*, 388 US 218; <u>87 S Ct 1926</u>; <u>18 L Ed 2d 1149 (1997)</u>……………… 8

United States v. Hill, 967 F.2d 226 (6th Cir.), cert. denied, 506 U.S. 964, 113 S.Ct. 438,
  121 L.Ed.2d 357 (1992)………………………………………………………….. 11

United States v. Russell, 532 F.2d 1063 (6th Cir.1976)………………………………….. 11

Ward v United States, 95 F2d 1317 (6th Cir. 1993)………………………………………  20

Washington v Smith, 219 F3d 620 (7th Cir. 2000)……………………………………….. 23

Wiggins v. Smith, 539 U.S. 510 (2003)……………………………………19, 20, 21, 24

Williams v. Taylor, 529 U.S. 362 (2000)…………………………………………………….. 6

Workman v Tate, 957 F2d 1339, 1345 (6th Cir. 1992)……………………………………… 23

**STATE CASES**

People v Franklin Anderson, 389 Mich 211 (1973)……………………………………… 11

People v Gray, 457 Mich 107 (1998)…………………………………………………...16

People v Johnson, 451 Mich 115 (1996)…………………………………………… 23

People v Kachar, 400 Mich 78 (1977) …………………………………………… 12

People v Young, 21 Mich App 684 (1990)……………………………………… 11

### STATEMENT OF QUESTIONS PRESENTED

I.     DID THE TRIAL COURT ERR REVERSIBLY IN REFUSING TO SUPPRESS TAINTED IDENTIFICAITON EVIDENCE AFTER PETITIONER'S *WADE* HEARING?

II.     WAS PETITIONER DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AND TO A FAIR TRIAL THROUGH TRIAL COUNSEL'S FAILURE TO PRESENT LONA BROWN'S TESTIMONY IN SUPPORT OF HIS ALIBI DEFENSE?

## STATEMENT OF FACTS

Petitioner's conviction arose out of a shooting that occurred on February 10, 2002 at approximately 5:00 a.m.   Detroit Police Officers Kevin Mitchell and Labrait Jackson were flagged down by occupants riding in a red, late model Intrepid and were then directed to a Coney Island restaurant.   Approximately ten people were standing outside and engaging in "an altercation, a [fist] fight between several men."  Officer Mitchell "broke the fight up" and placed Jevon Echols and Antoine Gibson under arrest.  The men were then transported to the 5th Police Precinct. (T, 6-10, 20; 9/24/02).

About an hour later, around 6:15 a.m., the officers received a run to the intersection of Cadieux and East Warren where they found a vehicle that had been hit with gunshots. (T, 10, 20; 9/24/02).

> They then received a broadcast of a person shot at …St.
> John's Hospital.  They proceeded to the hospital and found
> out that the vehicle…at Warren and Cadieux was the
> vehicle that the victim was driving.

(T, 11,20; 9/24/02).

The officers spike to LyShae Young at the hospital.  He had sustained a gunshot wound to this right shoulder.  (T, 12-13; 9/24/02).  After speaking with Young, they went back to Warren and Cadieux to recover the vehicle.  (T, 13; 9/24/02).

Lyshae Young and his friends, *viz.*, Antoine Gibson, Damian Gibson and Stanley Maybury, went to a Coney Island on February 10, 2002 around 5:00 a.m.  (T, 69; 9/24/02).

Young testified that he had gotten into a verbal altercation with defendant Devon Echols' brother, Jevon. (T, 25; 9/24/02).

> He said that he and Jevon never came to blows.  I just
> grabbed him…around his collar.  I pushed him down on the

1

> chair and I was trying to calm him down, telling him I'm
> just trying to keep everything cool so the police won't be in
> here.  Be cool.  And I walked away again.

(T, 26; 9/24/02).

Young said that after he had walked away,

[Jevon Echols] jumped up and ran at me again …

Young's friend, Antoine Gibson, then got into a tussling match with Jevon
Echols.

(T, 26-27; 9/24/02).

Young said that he and Stanley Maybury went to the 5th Precinct to try to get Antoine

Gibson out of jail but were unable to do so.  LyShae Young said he then decided to go to the gas

station to get something to drink.  (T, 31; 9/24/02).  However, when he reached the end of his

block, he saw a red and gold Intrepid.

Though it was around 5:30, 5:40 a.m. on this February morning, Young claimed it was

"getting light outside" and that the sun was coming up.  (T, 32; 9/24/02). Young said:

> Defendant signaled to turn my block.  But as he seen [sic]
> me come for the corner, he backed up and just stopped on
> the end of the corner.

(T, 31; 9/24/02).

Young said he looked at the driver of the Intrepid for 40 seconds before hearing at least 15 shots.

He said he was shot three times.  (T, 33-34, 94; 9/24/02).

LyShae said his parents took him to St. John's Hospital for treatment.  The next night an

officer by the name of Thurman showed him one photo of Devon Echols "and asked me if that

was the guy that shot me.  And I told him yes. "He said that he had "made the identification

based upon that."  (T, 35, 38-39; 9/24/02).  In describing his condition at the time, Young said,

"Like I said, I had a lot of drugs in my system."  (T, 78; 9/24/02).

When asked by the Court whether he had seen some police officers before that, meaning shortly after the shooting, Young said he had not.  (T, 39; 9/24/02).  Young also said that he did not know Devon Echols or the name Devon Echols before this incident.  (T, 40: 9/24/02).

In a separate record, Investigator Thurman testified that he went to see Young twice at the hospital.  (T, 47; 9/24/02). He said the first time Young was not coherent enough to speak with him.  (T, 47; 9/24/02).  He returned to the hospital at 6:45 p.m. the next day, on February 11 – which was long after Devon Echols had been arrested that afternoon at 1:50 p.m.  (T, 45, 47; 9/24/02).  As Investigator Thurman explained, he had Devon Echols arrested first, took Echols' picture, then took the picture to Young at the hospital.  (T, 45; 9/24/02).

Continuing on the separate record, Officer Mitchell testified that he went directly to St. John's Hospital after leaving the Harvard and Cadieux scene.  (T, 51; 9/24/02).  He said they reached the hospital before 7:00 a.m.  Contrary to Young's testimony that he had not spoken to any policeman before Thurman's arrival. Officer Mitchell said that he and his partner questioned Young for five, ten minutes about the incident.  (T, 53; 9/24/02).  According to Mitchell, Young said Devon Echols shot him.  (T, 52; 9/24/02.

Officer Labrait Jackson (Officer Mitchell's partner) testified they received a run to the hospital around 6:15 a.m. (T, 58; 9/24/02).  He said when they located Young in the trauma unit there was "an entire staff in there working on him.  They [the officers] were asking him questions, trying to ask him questions, because he was kind of groggy."  (T, 59; 9/24/02). According to Officer Jackson, Young said he had been shot by "the guy that was at the fight earlier, his brother."  (T, 60; 9/24/02).  The officer admitted that instead of quoting the complaint's exact words, he wrote in his report that Young "ID'd the Defendant as the shooter." (T, 61; 9/24/02).

This Court held that photo identification of Devon Echols at the hospital had been unduly suggestive:

> Anything that happened after the picture is suggestive, in this Court's opinion.  Because he [LyShae Young] didn't know his name, now he's calling him—he not even calling him "Echols," he's calling him…"Devon."  He never knew his name, now he's calling him Devon.  That's because so much has happened after point.

(T, 103; 9/24/02).

Jerod Martin testified that he was employed at Chrysler while Devon worked at Ford Motor Company.  He had known Devon for 12 years and they had gone to school together.  Martin said because he and Devon looked so much alike, there were times when he had been mistaken for Devon Echols.  (T, 20-21; 9/26/02).

On Sunday, February 10, Martin was out with Devon, Devon's brother and a guy named Kevin.  (T, 22; 9/26/02).  He said he was driving the defendant's Dodge Intrepid because he "was the only one with a valid driver's license."  (T, 27,32; 9/26/02).  After describing the Coney Island—affray, Martin said he dropped Devon off at his home on Nottingham Street, then took Kevin home.  (T, 20; 9/26/02).  He said he kept the Intrepid until about ten, ten-thirty that morning.  (T, 32; 9/26/02).  Martin then took the Intrepid over to Nottingham and left it with Devon's roommate, Donald Wiggins.  (T, 32; (9/26/02).

Kristen Finks testified that she has been romantically involved with Devon since 1999.  (T, 66; 9/26/02).  On February 10, she worked at the Matador Bar from 2:00 a.m. until 5:30, 5:45 a.m.  As soon as she left work, she went to Devon's house on Nottingham Street, which was about five minutes away.  (T, 65-66; 9/26/02).  She said they stayed up for about an hour, then "fell off to sleep."  Finks left Devon's home around 9:00 o'clock.  (T, 61; 9/26/02).  She testified

4

that she was rather certain that Devon had not gotten up in the interim because she slept on his abdomen, hugging him.  (T, 63; 9/26/02).

The jury convicted Devon Echols as charged.  (T, 4; 9/27/02).On August 20, 2007, in a one sentence Order, the Michigan Court of Appeals denied Petitioner's Application for Leave to Appeal without a hearing.  The Order acts as a denial on the merits.  *People v Echols,* No. 278675 (Mich. Ct. App. 2007) (attached as Appendix A to the accompanying Memorandum of Law.

Mr. Echols then timely filed an Application for Leave to Appeal to the Michigan Supreme Court, in which he again raised the identical issues presented in this petition.  The Michigan Supreme Court denied leave to appeal in an order issued on January 8, 2008. (*People v Echols*, No. 135042) (attached as Appendix B to the accompanying Memorandum of Law.

Mr. Echols now files this Writ of Habeas Corpus.

## STANDARD OF REVIEW

The standard of review is set forth in 28 U.S.C. § 2254(d)(1), which provides that a writ of habeas corpus may be granted if the state appeal "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" In *Williams v. Taylor*, 529 U.S. 362, 405 (2000), the Supreme Court explained the meaning of the "contrary to" prong: "A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases."

On the other hand, the "unreasonable application" prong applies to a "state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case[.]" *Id.* 529 U.S. at 406. The Court concluded that the issue under this prong is whether the state court's application "was objectively unreasonable." *Id.* at 408-412.

Petitioner has fairly presented his federal claims to state court in his appeals to the Michigan appellate courts. A petitioner may fairly present his federal claim to state court by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim "federal." *Baldwin v Reese, 541* U.S. 27, 124 S.Ct 1347, 1351 (2004). *See also Levine v Tornik,* 986 F.2d 1506, 1516 (6th Cir. 1993), *cert denied*, 509 U.S. 907 (1993) holding that a petitioner "fairly presents" his claim to the state courts by citing a provision of the Constitution, federal decisions using constitutional analysis, or state decisions employing constitutional analysis in similar fact patterns. State prisoners in Michigan must raise each claim in the Michigan Court of Appeals and in the Michigan Supreme Court before seeking federal habeas corpus relief as the Petitioner has done in this case. *See Manning v Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). In his state court briefs, Petitioner

argued the Sixth and Fourteenth Amendment rights and presented these issues to the Michigan

appellate courts.

I.     THE TRIAL COURT ERRED REVERSIBLY IN REFUSING TO
       SUPPRESS TAINTED IDENTIFICAITON EVIDENCE AFTER
       PETITIONER'S *WADE* HEARING.

In *Manson v. Brathwaite,* 432 U.S. 98, 116, 97 S.Ct. 2243, 2251-52, 53 L.Ed.2d 140

(1977) the Supreme Court established that if a suggestive out-of-court identification procedure

produces a substantial likelihood of irreparable misidentification, the in-court identification must

also be suppressed.  As will be discussed, Michigan unreasonably applied federal law to resolve an

unduly suggestive identification procedure.

At the trial court Devon Echols challenged the identification procedure, a single photo

array of Petitioner, and the court conducted an evidentiary hearing pursuant to *United States v*

*Wade*, 388 US 218, 228; 87 S Ct 1926; 18 L Ed 2d 1149 (1997).  (T, 38, 47-49; 9/24/02).  The

defense later moved for a mistrial and, alternatively, for suppression of the identification

evidence.  The trial court denied relief.  (T, 5; 9/25/02).  The Michigan Court of Appeals denied

the Application for Leave to Appeal as did the Michigan Supreme Court.

LyShae Young and his friends, Antoine Gibson, Damian Gibson and Stanley Maybury,

went to a Coney Island on February 10, 2002, around 5:00 a.m.  (T, 24; 9/24/02).  Young said he

had been out at an after-hours "joint" earlier that night. (T, 69; 9/24/02).  Young testified that he

had gotten into a verbal altercation with Petitioner's brother, Jevon. (T, 25; 9/24/02).  A short

time after the altercation, Young drove Stanley Maybury home.  Maybury lived across the street

from him on Harvard Street. (T, 30; 9/24/02).  LyShae Young then decided to go to the gas

station to get something to drink. (T, 31; 9/24/02).  However, when he reached the end of his

block, he said a red and gold Intrepid.  Though it was around 5:30, 5:40 a.m. on this February

8

morning, Young claimed it was "getting light outside" and that he sun was coming up.  (T, 32; 9/24/02).  He said:

> Defendant signaled to turn my block.  But as he seen [sic] me come for the corner, he backed up and just stopped on the end of the corner.
>
> (T, 31; 9/24/02).

Young continued:

> Well, I sit there and wait for like 30 seconds …waiting for him to go past.  He never go past, so I creep out and get ready to turn to go to the gas station.  And as I turn, I'm looking in the car and I see him reach out the window like he's gonna start shooting.  So I just lean over to the side.

(T, 32; 9/24/02),

Young said he looked at the driver of the Intrepid for 40 seconds before hearing at least 15 shots.  He said he was shot three times.  (T 33-34, 94; 9/24/02).  LyShae said his parents took him to St. John's Hospital for treatment.  The next night an officer by the name of Thurman showed him single photo of Devon Echols "and asked me if that was the guy that shot me.  And I told them yes."  He said that he had "made the identification based upon that."  (T, 35, 38-39; 9/24/02).  When asked by the trial court whether he had seen some police officers before that, meaning shortly after the shooting, Young said he had not.  (T, 39; 9/24/02).  Young also said that he did not know Devon Echols or the name Devon Echols before this incident.  (T, 40; 9/24/02).

In a separate record, Investigator Thurman testified that he went to see Young twice at the hospital.  (T, 47; 9/24/02).  He said the first time Young was not coherent enough to speak with him.  (T, 47; 9/24/02).  He returned to the hospital at 6:45 p.m. on February 11—which was long after Devon Echols had been arrested that afternoon around 1:50 p.m.  (T, 45, 47; 9/24/02).

As Investigator Thurman explained, he had Devon Echols arrested first, took Echols' picture, then took the picture to Young at the hospital. (T, 45; 9/24/02). The single photo display constituted an unduly suggestive identification procedure in violation due process.

Under the Due Process Clause, if an identification occurs in the context of a suggestive confrontation, it should be excluded when there is a "very substantial likelihood of misidentification." *Simmons v United States*, 390 US 377, 384, 88 S Ct 967; 19 L Ed 2d 1247 (1968). The reliability determination depends on the totality of the circumstances. *Stovall v Denno*, 388 US 293, 302; 87 S Ct 1967; 18 L Ed 2d 1199 (1967). The Due Process Clause test for when a suggestive out-of-court identification procedure requires suppression of an in-court identification is straightforward. If a suggestive out-of-court identification procedure produces a substantial likelihood of irreparable misidentification, the in-court identification must also be suppressed. *Manson v. Brathwaite,* 432 U.S. 98, 116, 97 S.Ct. 2243, 2251-52, 53 L.Ed.2d 140 (1977). Put another way, the in-court identification is admissible only if the witness has an "independent basis to identify the defendant in court."

A conviction based on identification testimony that follows a pretrial identification violates the defendant's constitutional right to due process whenever the pretrial identification procedure is so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Thigpen v. Cory,* 804 F.2d 893, 895 (6th Cir.1986), *cert. denied,* 482 U.S. 918, 107 S.Ct. 3196, 96 L.Ed.2d 683 (1987) (quoting *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968)). It is the likelihood of misidentification that violates the defendant's due process right. *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 381-82, 34 L.Ed.2d 401 (1972). The due process concern is heightened when that misidentification is possible because the witness is called upon to identify a stranger whom

she has observed only briefly, under poor conditions, and at a time of extreme emotional stress and excitement. *See Manson,* 432 U.S. at 112, 97 S.Ct. at 2251-52; *Simmons,* 390 U.S. at 383-84, 88 S.Ct. at 970-71; *United States v. Russell,* 532 F.2d 1063, 1066 (6th Cir.1976).

In assessing the validity of a pretrial identification, this Court follows a two-step analysis. The court first considers whether the procedure was unduly suggestive. *Thigpen,* 804 F.2d at 895. The defendant bears the burden of proving this element. *United States v. Hill,* 967 F.2d 226, 230 (6th Cir.), *cert. denied,* 506 U.S. 964, 113 S.Ct. 438, 121 L.Ed.2d 357 (1992). If the court does find that the procedure was unduly suggestive, it next evaluates the totality of the circumstances to determine whether the identification was nevertheless reliable. *Id.; see also Biggers,* 409 U.S. at 199-200, 93 S.Ct. at 382-83; *Thigpen,* 804 F.2d at 895. Five factors that are considered in assessing the reliability of the identification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention at the time of observation; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness when confronting the defendant; and (5) the length of time between the crime and the confrontation. *Manson,* 432 U.S. at 114, 97 S.Ct. at 2253; *Biggers,* 409 U.S. at 199-200, 93 S.Ct. at 382-83.

The single photo display to Young constitutes an unduly suggestive identification procedure and the identification is not reliable.  According to the Michigan Supreme Court, where a witness is shown only one person or a group in which one person is singled out in some way, the witness is tempted to presume that he is the person.  *People v Franklin Anderson*, 389 Mich 211; 205 NW2d 461, 489 (1973).  An impermissibly suggestive confrontation can exist whether or not counsel is present.  *People v Young*, 21 Mich App 684; 176 NW2d 420 (1970).

11

The grave dangers of misidentification have caused both state and federal courts to erect safeguards to protect against misidentification which would deny an accused's liberty without due process of law.  US Const, Am XIV; *United States v Wade*, *supra; People v Kachar*, 400 Mich 78, 90; 252 NW2d 807 (1977).  In *People v Kachar,* Michigan set forth eight factors to be used in determining whether there is clear and convincing proof that an adequate basis exists for the identifications, independent of prior tainted identifications.

The independent basis test in *Kachar* consists of the following:

**1.** Prior relationship with or knowledge of the defendant.

**2.** The opportunity to observe the offense.  This includes such factors as length of time of the observation, lighting, noise or other factor[s] affecting sensory perception and proximity to the alleged criminal act.

**3.** Length of time between the offense and the disputed identification.

**4.** Accuracy or discrepancies in the pre-lineup or showup description and defendant's actual description.

**5.** Any previous proper identification or failure to identify the defendant.

**6.** Any identification prior to lineup or showup of another person as defendant.

**7.** The nature of the alleged offense and the physical and psychological state of the victim.  In critical situations perception will become distorted and any strong emotions (as opposed to mildly emotional experiences) will affect not only what and how much we perceive, but also will affect our memory of what occurred.  Factors such as fatigue, nervous exhaustion, alcohol and drugs, and age and intelligence of the witness are obviously relevant.

**8.** Any idiosyncratic or special features of defendant.  *Gray* at 116; (quoting *Kachar*, 400 Mich at 95-96; internal brackets, ellipses, quotation marks, and citations omitted; emphasis in original removed).

12

There is no real dispute that Young's pre-trial identification of Petitioner was procured by an unnecessarily suggestive line-up. "Unnecessary suggestiveness depends 'upon whether the witness's attention was directed to a suspect because of police conduct.' " *Id.* at 469-70 (quoting 2-5 Crim. Con. Law § 5.05(2)(b) (2004)). Quite improperly, Young was shown only one photo, that of the Petitioner. This method clearly signaled out Petitioner such that the procedure contained "a very substantial likelihood of irreparable misidentification." *Neil,* 409 U.S. at 198, 93 S.Ct. 375 (quoting *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)).

Under either the factors in *Kachar* or the test established in *Manson*, Young's in-court identification of Mr. Echols as the shooter fails every single prong.  Turning first to the eight *Kachar* factors:

**1. "Prior Relationship With or Knowledge of the Defendant."**

Young only recalled the Petitioner from the neighborhood, but did not know Devon Echols or the name Devon Echols before this incident.  (T, 40; 9/24/02).  Young also said that he did not know Devon Echols or the name Devon Echols before this incident.  (T, 40; 9/24/02).

**2. "The Opportunity to Observe the Offense."**

This includes the length of time of observation, lighting, and other factors affecting sensory perception.  These factors militate against a proper identification because complainant Young observed his assailant in the darkness from a considerable distance away.   Citing transcript references where complainant Young described the circumstances surrounding the earlier Coney Island—altercation, the trial court concluded that he "had sufficient opportunity to observe the car and the perpetrator."   The Court clearly erred in seizing on the complainant's ability to describe the circumstances occurring *before* the shooting incident.   Under *Kachar*, what is relevant are the factors affecting the complainant's sensory perceptions at the time of the criminal act.

Although the offense occurred around 5:30, 5:40 a.m. on February 10, 2002, Young claimed it was "getting light outside" and that the sun was coming up."  (T, 32; 9/24/02). Defendant Echols asks this Court to take judicial notice of the U.S. Naval Observatory Astronomical Applications Department Website.  As the February 10, 2002—Sun and Moon Data for Detroit, Michigan show, sunrise occurred at 7:36 a.m.-two hours after the shooting incident.  (See Exhibit C).  The data from http://www.sunrisesunset.com/calendar.asp is also attached.

Michigan Rule of Evidence 201(b) permits a Court to take judicial notice of facts which are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Judicial notice may be taken at any state of the proceedings.  MRE 201 (e).

The factors affecting Young's sensory perception clearly were not very good.  He erroneously perceived that the shooting took place at sunrise when unquestionably it did not. When it is considered that he had been hanging out at an after-hours joint earlier that night, his skewed perceptions may be attributable to sleep-deprivation and the influence of intoxicants.  (T, 69; 0/24/02)

**3.   "Length of Time Between the Offense and the Disputed Identification."**

Regarding this factor, the trial court said it was:

> Satisfied that Complainant identified the Defendant at least by the night after the incident and that there was no extending period of time when the complainant's memory have been compromised.  October 10, 2003-Opinion and Order Denying Defendant's Motion for a New Trial, p.4. (T,39; 9/24/02).

The problem here is that the court rested its finding on the one-on-one identification procedure that it previously found to have been unduly suggestive.  (T, 103; 9/24/02).

LyShae Young testified that his parents took him to St. John's Hospital for treatment after the shooting.  The next night he said officer Thurman showed him one photo of Devon Echols "and asked me if that was the guy that shot me.  And I told them yes."  He said he had "made the identification based upon that."  (T, 35, 38-39; 9/24/02).

Moreover, the record belies the court's finding "that there was no extending period of time when the Complainant's memory [was] compromised."  The trauma of the gunshot wounds and resulting surgery (T, 39; 9/24/02) and other medical treatment definitely impaired LyShae Young's ability to recall. (T, 39; 9/24/02).   Moreover, by his own admission, he "had a lot of drugs" in his system.  (T, 78; 9/24/02).

Officer Labrait Jackson testified to receiving a run to the hospital shortly after the shooting incident, around 6:15 a.m. (T, 58; 9/24/02).  When he and his partner, Officer Mitchell, Located Young in the trauma unit, he said there was "an entire staff in there working on him.  They [the officers] were asking him questions, *trying to ask him questions*, because he was kind of groggy".  (T, 59; 9/24/02) (italics supplied).

Investigator Thurman gave a similar account of Young's lack of lucidity.  He testified that he went to see Young twice at the hospital.  (T, 47; 9/24/02).  The first time, Young was not coherent enough to speak with him.  (T, 47; 9/24/02).  He returned to the hospital the next day, on the February 11 at 6:45 p.m.  (T, 45, 47; 9/24/02).

If the police officers, in fact, spoke to Young after the shooting, his lapse of memory is beyond all doubt.  When asked by the Court whether he had seen some police officers before seeing Investigator Thurman, Young said he had not.  (T, 39; 9/24/02).

**4. "Accuracy or Discrepancies in the Pre-Lineup or Showup Description and Defendant's Actual Description."**

Young denied ever identifying Devon Echols as his assailant while speaking to Officers Jackson and Mitchell.  (T, 39; 9/24/02).

**5.  "Any Previous Proper Identification or Failure to Identify the Defendant."**

Again, Young clearly testified that he spoke to no police officers before seeing Investigator Thurman the day after the shooting.  (T, 39; 9/24/02).

**6.  "Any Identification Prior to Lineup or Showup of Another Person as Defendant."**

There was no prior identification of another person, so this factor was inapplicable.

**7.  "The Nature of the Alleged Offense and the Physical and Psychological State of the Victim."**

The court erroneously concluded that the "Complainant was in a sound psychological state before, during and after the attack" as a shooting is a harrowing experience that would cause a person to suffer a substantial amount of stress.  (See the October 10, 2003-Opinion and Order Denying Defendant's Motion for a New Trial, p.5.).

**8.  "Any Idiosyncratic or Special Features of Defendant."**

Defendant Echols' photo was the *only* one shown to the complainant.   "When 'the witness is shown only one person or a group in which one person is singled out in some way, he is tempted to presume that he is the person.'  *People v Gray*, 457 Mich 107; 577 NW2d 92, 94 (1998) (officer went to victim's residence, informed her they had arrested defendant, and showed her a single color photograph of defendant; held, display of single photograph, combined with statement that "this was the man the police had arrested for the assault," was "highly suggestive").

In short, all eight *Kachar* factors compel the conclusion that the witness had no independent basis to identify Mr. Echols in court.  However, after reviewing only a few of the *Kachar* factors and making ambiguous or equivocal findings on those factors, the trial court admitted not only the

16

in-court identification but also the suggestive out-of-court identification as well (T 6/23 87-89). Young was thus allowed to identify Mr. Echols as the shooter in court during the trial in violation of the Due Process Clause (T 6/23 153).

On balance, the *Manson* factors point to the conclusion that Young's testimony was unreliable. Against these five factors, the reviewing court must weigh the corrupting effect of the suggestive out-of-court identification. *Id.* Finally, the same result obtains under the *Manson* test.

**(1)  "The Opportunity of the Witness to View the Criminal at the Time of the Crime."**

This factor is the same as *Kachar* Factor 2, discussed above.

**(2)  "The Witness' Degree of Attention."**

This factor essentially overlaps with *Kachar* Factors 2 and 7.  *Compare Manson* at 115 (finding witness degree of attention high because he was trained police officer of same race as suspect).

**(3)  "The Accuracy of His Prior Description of the Criminal."**

This factor is the same as *Kachar* Factor 4, discussed above.

**(4)  "The Level of Certainty Demonstrated at the Confrontation."**

This factor, which has no counterpart in the *Kachar* factors, also plainly cuts against a finding of reliability because Young was shown only a single photo to make an identification. There was great uncertainty here, when the testimony of Mr. Young is compared with the circumstances of the one-on-one photo showup.

Young admitted that he had made the identification based upon this tainted procedure. (T, 35, 38-39; 9/24/02).  He identified Mr. Echols because Investigator Thurman impermissibly suggested that he was the assailant.

**(5)  "The Time Between the Crime and Confrontation."**

This factor is the same as *Kachar* Factor 3.

Thus, under either the *Kachar* or *Manson* test, Mrs. Young's identification of Petitioner fails every single prong.  The trial court erred in failing to consider all of the prongs of either test, in making ambiguous and incomplete findings on the prongs it did consider, and, in the teeth of the undisputed evidence, somehow concluding that Young's testimony did not present a substantial risk of misidentification.  A straightforward application of either test leads inescapably to the conclusion that Young's in-court identification was unconstitutionally unreliable and should have been excluded.

In summary, the trial court erred reversibly by using the independent basis test to admit the out-of-court suggestive identification into evidence in direct violation of federal precedent.  The court erred by allowing Young's in-court identification testimony even though it is clear under both the Michigan and federal tests that she had no independent basis for that testimony and that it was extremely unreliable.  In a very close case in which everything turned on identification, neither error could possibly be harmless. On this record, there are strong indications that the tainted identification evidence was prejudicial, and absent that evidence there was a reasonable probability that the outcome would have been different at defendant's trial. This prejudicial error entitles Petitioner to a new trial.

**II.    PETITIONER WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AND TO A FAIR TRIAL THROUGH TRIAL COUNSEL'S FAILURE TO PRESENT LONA BROWN'S TESTIMONY IN SUPPORT OF HIS ALIBI DEFENSE.**

As this Court recognized in *Matthews v. Abramajtys,* 319 F.3d 780, 789-90 (6th Cir.2003) and *Blackburn v. Foltz,* 828 F.2d 1177, 1182-83 (6th Cir.1987), the failure to call a known alibi witness generally would constitute ineffective assistance of counsel.   Therefore, Michigan engaged in an "unreasonable application of" the principles established in those decisions.

The Supreme Court has "emphasized that the Sixth Amendment right to counsel exists 'in order to protect the fundamental right to a fair trial.'" *Lockhart v. Fretwell*, 506 U.S. 364, 368 (1993) (quoting *Strickland v. Washington*, 466 U.S. 668, 684 (1984)). "In *Strickland*, [the Court] identified the two components to any ineffective-assistance claim: (1) deficient performance and (2) prejudice." *Id.* at 368. *See also Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). To show a violation of the Sixth Amendment right to effective assistance of counsel, a petitioner must establish that his attorney's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687.

An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. The defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. The Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688) (internal quotes omitted).

19

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. The defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.   The essential question is "whether better lawyering would have produced a different result."   *Ward v United States,* (95 F2d 1317, 121 (CA 6, 1993).  Unless the petitioner demonstrates both deficient performance and prejudice, "it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687.

The Petitioner is entitled to relief on his ineffective assistance of counsel claim because he can demonstrate deficient performance and prejudice. Petitioner argues that his trial counsel rendered ineffective assistance in two related ways: first, by failing to conduct a reasonable investigation into Lona Brown and second, by failing to call Brown as a defense witness.  It is well-established that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691. The duty to investigate derives from counsel's basic function, which is "'to make the adversarial testing process work in the particular case.' " *Kimmelman v. Morrison,* 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) (quoting *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052).

Trial counsel's duty includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence. *See Bryant v. Scott,* 28 F.3d 1411, 1419 (5th Cir.1994) (citing *Henderson v. Sargent,* 926 F.2d 706, 711 (8th Cir.1991). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for

20

reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega,* 528 U.S. 470, 481, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000); *accord Clinkscale,* 375 F.3d at 443. A purportedly strategic decision is not objectively reasonable "when the attorney has failed to investigate his options and make a reasonable choice between them." *Horton v. Zant,* 941 F.2d 1449, 1462 (11th Cir.1991) (cited in *Combs,* 205 F.3d at 288).

Courts have not hesitated to find ineffective assistance in violation of the Sixth Amendment when counsel fails to conduct a reasonable investigation into one or more aspects of the case and when that failure prejudices his or her client. For example, in *Wiggins v. Smith,* the Supreme Court held that the petitioner was entitled to a writ of habeas corpus because his counsel had failed to conduct a reasonable investigation into potentially mitigating evidence with respect to sentencing. 539 U.S. at 524-29, 123 S.Ct. 2527. According to the Court, "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentence strategy impossible." *Id.* at 527-28, 123 S.Ct. 2527.

Consistent with *Wiggins,* this Court has held, in a variety of situations, that counsel's failure to investigate constituted ineffective assistance in violation of the Sixth Amendment. *See, e.g., Combs,* 205 F.3d at 287-88 (holding that defense counsel was constitutionally ineffective for failing to investigate adequately his own expert witness, who testified that, despite the defendant's intoxication at the time of the crime, the defendant nevertheless was capable of forming the requisite intent to commit the crimes); *Sims v. Livesay,* 970 F.2d 1575, 1580-81 (6th Cir.1992) (holding that counsel was constitutionally ineffective for failing to conduct an investigation into certain physical evidence that would have undermined the prosecution's theory

that the victim was shot at a distance); *Blackburn v. Foltz,* 828 F.2d 1177, 1183 (6th Cir.1987) (holding that counsel's failure "to investigate a known and potentially important alibi witness" constituted ineffective assistance because "[c]ounsel did not make any attempt to investigate this known lead, nor did he even make a reasoned professional judgment that for some reason investigation was not necessary" ); *see also Clinkscale,* 375 F.3d at 443 (collecting cases in which counsel's failure to investigate a potentially important witness constituted ineffective assistance).

Petitioner asserts that his defense counsel knew about an alibi witness, Lona Brown, but refused to communicate with her about testifying as an alibi witnesses. In the state courts and in the district court, no one has debated whether this allegation, if true, would present a serious Sixth Amendment claim.  The failure to call a known alibi witness generally would constitute ineffective assistance of counsel . *See, e.g., Matthews v. Abramajtys,* 319 F.3d 780, 789-90 (6th Cir.2003); *Blackburn v. Foltz,* 828 F.2d 1177, 1182-83 (6th Cir.1987).  The Michigan appellate courts resolved this issue against Petitioner by failing to address the claims.

Devon Echols maintains that trial counsel's failure to call Lona Brown to buttress his alibi defense constituted ineffective assistance of counsel.  Brown's bedroom was directly above Petitioner's and that she could hear sounds coming from his bedroom because of the connecting vents.  Around 5:00 or 5:30 a.m. on the day Petitioner was arrested, she heard the Petitioner laughing and talking in his bedroom.  She also heard a female voice laughing and talking with him.  Ms. Brown later told the Petitioner that she wanted to testify to these observations in court.

Mr. Echols avers that he advised trial counsel, Todd Perkins, of Lona Brown's proposed alibi testimony.  He further says he gave counsel Ms. Brown's name and contact information and

22

Mr. Perkins initially said he would contact her.  Yet, Mr. Perkins proceeded to trial without ever contacting her.

Failure to call alibi witnesses or present an alibi defense constitutes ineffective assistance of counsel.  Trial counsel owed defendant Echols "a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 US at 691.  "A failure to investigate can certainly constitute ineffective assistance." *Washington v Smith*, 219 F3d 620, 630 (CA 7, 2000).

An attorney's failure to call witnesses has been found to constitute ineffective assistance, requiring a new trial even where some of the testimony was cumulative.  *People v Johnson*, 451 Mich 115, 120-121, 124; 545 NW2d 637 (1996).  Counsel's failure here resulted in actual prejudice to the defense.  Had Lona Brown been called, her testimony would have greatly enhanced the alibi—testimony offered by Devon's girlfriend, Kristin Finks.

Mr. Perkins' performance must be deemed deficient for the failure to investigate and present this witness.  See *Workman v Tate*, 957 F2d 1339, 1345 (CA 6, 1992) (finding counsel deficient for failing to interview and call two witnesses who were with defendant at time of his arrest for felonious assault and having a weapon while under a disability); *see also, Tucker v Prelesnik*, 181 F3d 747, 756 (CA 6, 1999) (finding counsel deficient for proceeding unprepared and failing to obtain complaining witness's medical records to use for impeachment at trial on assault charge).

As in the foregoing cases, discussions trial counsel's failure to conduct a reasonable investigation into Lona Brown, "a known and potentially important witness," *Blackburn,* 828 F.2d at 1183, violated Petitioner's Sixth Amendment right to the effective assistance of counsel. Petitioner has successfully satisfied both the deficiency and prejudice prongs of *Strickland.* With

regard to the deficiency prong, the facts as recited above demonstrate that counsel made absolutely no attempt to communicate with Brown, despite his knowledge that she existed. Without even attempting to interview Brown, counsel simply decided not to her as a witness. That decision was objectively unreasonable because it "was a decision made without undertaking a full investigation" into whether Brown could assist in Petitioner's defense. *Combs,* 205 F.3d at 288. By failing even to contact Brown counsel "abandoned his investigation at an unreasonable juncture, making a fully informed decision with respect to [whether to call Brown as a witness] impossible." *Wiggins,* 539 U.S. at 527-28, 123 S.Ct. 2527.

Counsel could not have evaluated or weighed the risks and benefits of calling Brown as a defense witness without so much as asking Brown what she would say if called. Without having any contact with Brown, counsel "was ill equipped to assess [his] credibility or persuasiveness as a witness," or to evaluate and weigh the risks and benefits of putting her on the stand. *Bryant,* 28 F.3d at 1419 (finding ineffective assistance where counsel failed to interview a witness who admitted to committing the crime and maintained that the defendant was not involved). It was objectively unreasonable for counsel to make that decision without first investigating Brown, or at least making a reasoned professional judgment that such investigation was unnecessary. *See id.* ("Although factors tending to diminish [the witness's] credibility might support a strategic decision not to call [him] at trial, those considerations do not suggest that [counsel's] failure to investigate [his] testimony was a strategic decision.").

With regard to *Strickland*'s prejudice prong, the record contains ample evidence indicating that but for counsel's ineffectiveness, there is a reasonable probability that Petitioner would have been acquitted. Petitioner has consistently maintained to the police and to others that he was not involved in the crimes for which he was convicted. Had counsel interviewed Brown,

he would have discovered as much and probably would have put her on the stand-depending in part upon what other information counsel's investigation uncovered. In short, there is a reasonable probability that had the jury heard Brown's testimony, it would have acquitted Petitioner.

Petitioner's claim of prejudice is further supported by the notable weaknesses in the prosecution's case. The Supreme Court has explained that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696, 104 S.Ct. 2052; *Clinkscale*, 375 F.3d at 445. The only evidence linking Petitioner to the crime was the eyewitness testimony of Young. This Court has repeatedly expressed its "grave reservations concerning the reliability of eyewitness testimony," *Clinkscale*, 375 F.3d at 445 (quoting *Blackburn*, 828 F.2d at 1186 (citation omitted)), and Young's identification of Petitioner in this case was particularly questionable as recognized by the trial court.   (See Issue I). As previously discussed, the identification was admittedly tentative and was based solely on a unduly suggestive procedure, a single photo array. In light of the relatively scant evidence of Petitioner's guilt, his counsel's ineffectiveness must be deemed especially prejudicial.

**RELIEF REQUESTED**

For these reasons, Petitioner Devon Echols, respectfully requests:

A. That respondent be required to appear and answer the allegations of this Petition;

B. That after full consideration, this Court grant this Petition and order Devon Echols either be promptly retried or released from custody;

C. That this Court grant such other, further, and different relief as the Court may deem just and proper under the circumstances.

Dated:  January 7, 2009

Respectfully submitted,

_/s/_____
JAMES E. CZARNECKI II (P67847)
39999 Garfield Road
Clinton Township, MI 48038
586.228.3900